UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LAYE KABA,                                              :

                     Petitioner,         :        **MEMORANDUM DECISION**

                 - v -                :        20-CV-4011 (DC)

CHRISTOPHER MILLER,                            :

                    Respondent.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPEARANCES:            LAYE KABA
                            Petitioner *Pro Se*
                            DIN 14A1828
                            Attica Correctional Facility
                            Box 349
                            639 Exchange Street
                            Attica, NY 14011

                            ERIC GONZALEZ, Esq.
                            Kings County District Attorney
                            By:    Solomon Neubort, Esq.
                                     Assistant District Attorney
                            350 Jay Street
                            Brooklyn, New York 11201
                                     Attorney for Respondent

CHIN, Circuit Judge:

         On March 12, 2014, following a jury trial, Petitioner Laye Kaba was

convicted in the Supreme Court of the State of New York, Kings County (Guzman, *J.*),

of attempted first-degree rape, first-degree sexual abuse, second-degree burglary as a

sexually motivated felony, and criminal obstruction of breathing.  Dkt. 6 at 20.  The

Appellate Division, Second Department, affirmed his convictions, *People v. Kaba*, 107

N.Y.S.3d 720 (2d Dep't 2019) ("*Kaba I*"), and the New York Court of Appeals denied his

application for leave to appeal, *People v. Kaba*, 139 N.E.3d 833 (N.Y. 2019) (Rivera, J.)

("*Kaba II*").

On October 15, 2020, Kaba, proceeding *pro se*, filed this petition for a writ

of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition").  Dkt. 1.  Respondent,

represented by the District Attorney of Kings County, filed his opposition to the Petition

on December 21, 2020.  Dkt. 6.

On February 2, 2024, the case was reassigned to the undersigned.

For the reasons that follow, the Petition is DENIED.

## STATEMENT OF THE CASE

**A.    *The Facts*[1]**

The evidence at trial established the following:

In the early morning of November 16, 2012, at about 5:00 a.m., a woman

was walking in Brooklyn on her way home from a party, intoxicated.  Dkt. 7 at 532.

While the woman was on Kent Avenue, Kaba -- a man whom the woman did not know

-- grabbed her and put his arm around her.  *Id.* at 537.  Kaba asked the woman whether

---

[1] The facts are drawn from the People's brief on the direct appeal to the Appellate Division,
which was filed in this Court as part of Respondent's Opposition to the Petition and is
supported by detailed citations to the record, including the trial transcript.  *See* Dkt. 7 at 815-44.

she wanted someone to walk her home, and the woman told Kaba to leave her alone. *Id.* at 537-38. Kaba kept following the woman as she walked to the entrance of her apartment building. *Id.* at 538. When the woman arrived at her building, she unlocked the door, and Kaba followed her into the lobby and to the building's mailroom. *Id.* The woman repeatedly asked Kaba to leave. *Id.* Instead, Kaba approached the woman and tried to "hug . . . or grab [her]," at which point the woman "pushed him away." *Id.* Kaba responded by "attack[ing] [the woman] and pinn[ing her] to the ground." *Id.* Kaba choked the woman with his hands and with her scarf, groped her, put his finger in her mouth, pulled down her stockings and underwear, pinned her to a wall, threw her to the ground, and tried to rape her. *Id.* at 538-42.

After a period of struggle, in which the woman was "kicking and screaming," *id.* at 540, Kaba eventually "got off" of the woman, whom he had been straddling on the floor with his penis exposed. *Id.* at 540-43. Kaba helped the woman to stand up, and as he did so, the woman pushed and kicked him. *Id.* at 451. Kaba then took his backpack and left, and the woman went up the stairs at the back of the lobby to her apartment. *Id.* at 543. The sexual assault was captured and recorded by security cameras. *Id.* at 425-27.

On November 22, 2013, officers arrested Kaba and detained him for questioning. After he was read his *Miranda* rights, Kaba made oral, written, and videotaped statements to Detectives Danielle Kenny and Niurca Quinones, admitting

3

that he had had a sexual encounter with the victim, but claiming that the victim "wanted to have sex with him." *Id.* at 442-460.[2]

Specifically, Kaba told police that "two or three weeks ago," he had noticed an intoxicated woman walking, and he asked her whether she was okay. *Id.* at 456. Although she said that she was okay, Kaba noticed that she was being followed by another man, and so he offered to walk her home. *Id.* at 457. While Kaba was accompanying her home, the woman dropped her pocketbook and wallet, and he helped her pick up those items. *Id.* Kaba asserted that, when they arrived at the lobby of the building where the woman lived, she wanted to give him a hug, and so he hugged her. *Id.* at 458. After they hugged, the woman asked Kaba to "put [her] on the floor" and they began to have a sexual encounter. He stated that the woman said, "no problem, let's do it." *Id.* Kaba then started to put a condom on, and the woman got upset and began kicking him. *Id.*

After giving these statements, Kaba signed a form, in which he granted his consent for the police to search his home. *Id.* at 474-75. Detective Kenny then went to Kaba's home with Sergeant Samuels, and there, they met Kaba's girlfriend, Scherieka Sanders-Jones. *Id.* at 475. The officers had Sanders-Jones sign a form granting consent to search the apartment. *Id.* at 476-77. When the officers entered the apartment, they

_____

[2] The three statements -- oral, written, and videotaped -- were substantially the same. *See id.* at 826.

4

went to a bedroom and saw a blue backpack, gray New Balance sneakers, a white

striped New York baseball cap, and a gray and white striped zip down sweater, each of

which matched the outfit of the suspect on the surveillance video. *Id.* at 478, 481.  Eight

sealed condoms and one open wrapper were in the backpack. *Id.* at 481.  After

searching Kaba's home, Detective Kenny told Kaba he was under arrest. *Id.* at 488.

**B.**     ***Procedural History***

    *a.*     ***State Court Proceedings***

        *1.*     ***Pre-Trial Proceedings***

On November 20, 2013, the trial court (Gary, J.) held a suppression

hearing regarding the admissibility of the oral, written, and videotaped statements

Kaba made to detectives on November 22, 2012. *Id.* at 1-2.  Only Detective Kenny

testified at the hearing. *Id.* at 3-51.  Detective Kenny's testimony established the

following:

On November 19, 2012, at 2:00 p.m., Detective Kenny received a call that a

woman had been sexually assaulted and was at Woodhull Hospital, and so Detective

Kenny went to the hospital to interview her. *Id.* at 4-5.  The woman told Detective

Kenny that two days earlier, on Saturday night, she was walking home from a party,

when a Black man with a Caribbean accent approached her, walked her home, and

raped her. *Id.* at 5-6.  Detective Kenny then went to the woman's apartment building to

obtain surveillance footage. *Id.* at 6.  There, Detective Kenny interviewed the building's

general manager, Reuben Gross, who had called 911 after his routine review of the building's recorded security video footage revealed a woman being assaulted. *Id.* at 6.

The next day, on November 20, 2012, Detective Kenny and her partner Detective Sheehan, together with the woman, canvassed the area and brought the woman to the Brooklyn Special Victims Squad to view photographs of the potential assailant. *Id.* at 7. The woman did not identify any of the individuals in the photos as her assailant. *Id.* The following day, on November 21, 2012, the police took the video footage and a "Wanted" flyer that they had created -- which featured a screenshot of Kaba from the video -- to local businesses to see if anyone could identify Kaba. *Id.* at 8-9. As part of this canvass, Detective Sara Mathers went to a homeless shelter at 89 Porter Avenue, where shelter employees identified the man in the video as Kaba. *Id.* at 9. The employees stated that Kaba was a former resident of the shelter. *Id.* at 9-10. Detective Kenny prepared a photo array that included a photograph of Kaba and showed it to the woman who had been assaulted, but she still could not identify anyone in the array. *Id.* at 10.

Detective Kenny filed an investigative card for Kaba, so that other police officers would know that he was wanted for questioning. *Id.* The next day, on November 22, 2012, someone at the shelter at 89 Porter Avenue informed the police that Kaba had gone to the shelter to check his mail. *Id.* at 11. At about 2:30 p.m., police

officers brought Kaba to the Special Victim Squad office and, while he was "uncuffed," placed him in a holding cell. *Id.* at 11-12.

Detectives Kenny and Quinones then entered the holding cell to speak with Kaba. *Id.* at 12. Detective Kenny testified that neither officer had their gun while in the cell. *Id.* When Detective Kenny saw Kaba, she realized that he looked like the assailant on the video and noticed that he was wearing the same headphones as the assailant in the video footage. *Id.* at 33-34. At that point, Detective Kenny decided that Kaba was not free to leave and that she was going to place him under arrest. *Id.* at 34. Detective Kenny did not, however, tell Kaba at that point that he was under arrest. *Id.* at 34-36.

At about 3:00 p.m., approximately half an hour after Kaba's arrival at the unit, Detectives Kenny and Quinones began questioning Kaba. *Id.* at 27. Detective Kenny first read Kaba his *Miranda* warnings. *Id.* at 12-13. Detective Kenny had Kaba sign "yes" and place his initials on a written copy of the warnings as she read them. *Id.* at 14-17. Kaba waived his *Miranda* rights by agreeing to speak with the officers. Kaba then gave an oral statement where he recounted meeting the woman, walking her home, and attempting to have sex with her. *Id.* at 17.

In the middle of Kaba's oral statement, Detective Kenny showed him a picture from the "Wanted" flier, and Kaba identified himself as the person depicted in the photo. *Id.* at 17-19. Detective Kenny later testified that it was possible she "might

7

have" intentionally folded the flyer in "such a way that [Kaba] would not realize that the photo he was being shown was actually part of a wanted poster." *Id.* at 45; Dkt. 6 at 5 n.4.  After Kaba gave his oral statement, the officers asked Kaba if he wanted to write a written statement.  *Id.* at 17.  Kaba stated that "he speaks better than he writes," *id.,* and the officers offered to write the statement for him.  *Id.*  Kaba agreed.  *Id.*

At about 3:35 p.m., Kaba gave his statement, which was transcribed by Detective Quinones.  *Id.* at 20.  He then read and signed the three-page statement that Detective Quinones had written down on his behalf and signed that he had asked Detective Quinones to write it.  *Id.* at 21.

After Kaba gave his written statement, which took about five to ten minutes, *id.* at 28, the detectives asked him whether he was willing to give a video-recorded statement, and a DNA sample.  *Id.* at 23.  Kaba said that he was willing to do both.  *Id.*  Kaba did not ask for a lawyer at any time before he gave his video-recorded statement.  *Id.*  Kaba returned to the holding cell and waited there until 6:30 p.m. (approximately two and a half hours).  *Id.* at 28.

Kaba asked, just before his video statement, to call his family.  Detective Kelly did not permit him to make the call.  *Id.* at 37-38.  At about 6:30 p.m., Kaba gave a

video-recorded statement to Assistant District Attorney Victoria Nunez and to

Detective Kenny. *Id.* at 24.

Detective Kenny testified that she thought it possible that she "might

have" told Kaba at some point during the interview that, if he gave a statement, then the

police would let him go home and see his family. *Id.* at 36. Although Detective Kenny

could not testify at the hearing with absolute certainty that she had not made such a

promise to Kaba, she stated "I don't believe I told him that he was going back home."

*Id.* at 37.

At the conclusion of the hearing, defense counsel moved to suppress

Kaba's statements on the ground that (1) when Detective Kenny first met with Kaba, she

did not inform him that he was under arrest, (2) Kaba had issues with his "ability

definitely to write, [and] possibly [also] in his ability to speak English," *id.* at 53, and (3)

Detective Kenny might have promised Kaba that, if he gave her a statement, then he

could go home. Counsel also moved to suppress Kaba's statements on the ground that

Detective Kenny's testimony was unreliable because some of her testimony was

inconsistent, and she could not recall every detail of her encounter with Kaba. *Id.* at 51-

54.

The People argued that "the crime in question is completely on

surveillance video," *id.* at 55, and there was strong corroborating evidence in the form of

"[m]ultiple employees" who identified Kaba. *Id.* Kaba's own identification of himself in

the video, the People argued, "certainly" created "probable cause for arrest." *Id.*

Moreover, the prosecution maintained that Kaba was given bathroom access, food, and

water, and that it had proven, beyond a reasonable doubt, that Kaba "knowingly,

voluntarily, and intelligently" waived his *Miranda* rights, with at least one of those

waivers occurring on video. *Id.* at 55-56

   The trial court concluded that whether Kaba was handcuffed in the

holding cell "is totally irrelevant" and stated that "it is clear [Kaba] was in custody." *Id.*

at 59. The court also found -- based on the building manager's 911 call, the surveillance

video, and reports from other officers, and Detective Kelly's identification of Kaba in the

holding cell -- that there was "ample" probable cause to arrest Kaba. *Id.* at 60-61.

Turning to the *Miranda* issue, the court found that Kaba "waived all his *Miranda* rights."

*Id.* at 61. The court found "nothing about the time frame [from 2:30 p.m. until 6:43 p.m.]

that is in any way coercive." *Id.* at 62. The court concluded that the prosecution proved

beyond a reasonable doubt that Kaba "understood everything that was asked of him,"

and that "he had absolutely no problem with comprehending English." *Id.* After

making these findings of fact, the court reserved decision, directing the parties to "get

[the court] relevant case law" on whether Kaba's waiver and statements were "based

upon a promise from the detective." *Id.* at 64-65.

   About two weeks later, on December 2, 2013, the parties again appeared

before the hearing court and defense counsel informed the court that Kaba wanted to

reopen the hearing to testify "specifically concerning the promises." *Id.* at 69.  The court

denied the motion to reopen the hearing.  *Id.* at 70-72.  The court assured Kaba that he

could testify at trial, and that counsel would be permitted to argue to the jury that

Kaba's statements were not voluntarily made and should therefore be disregarded.  *Id.*

        The court then issued its decision on the motion to suppress.  The court

framed the essential issue on the suppression motion as "whether the police used a

stratagem that amounted to deception that was so fundamentally unfair as to deny due

process or that a promise or threat was made that could induce a false confession." *Id.*

at 74.  It held that because Detective Kenny could not state affirmatively that she had

not promised Kaba that, if he gave a statement, then he could go home, the court would

assume, for purposes of the hearing, that Detective Kenny had made a promise of that

nature.  *Id.* at 72.  But it nevertheless held that the promise "did not vitiate" the

voluntariness of Kaba's statements, and therefore the statements were admissible at

trial.  The court arrived at this conclusion largely because, "but for the fact that he

admitted that he was the person on the surveillance video, everything else [Kaba] sa[id]

is to the effect that he did not commit any crime." *Id.* at 76.

## 2.    *The Trial*

        Kaba was charged with attempted first-degree rape, first-degree sexual

abuse, second-degree burglary as a sexually motivated felony, and criminal obstruction

of breathing.  At trial, Reuben Gross, the general manager of the building where the

11

sexual assault occurred, testified that he alerted the police after seeing the surveillance video, and the video was played for the jury.  *Id.* at 421-32.  Detectives Kenny, Mathers and Quinones also testified for the People, detailing their interactions with the victim in the days after the assault, as well as the statements made by Kaba while he was in custody.  *Id.* at 432-506, 507-12.  Police Officer Arthur Krukoswki, the officer who picked up Kaba from the shelter, testified as well.  *Id.* at 512-23.  The victim herself also testified about what happened the night she was assaulted.  *Id.* at 529-52.  Only Kaba testified on his behalf.  *Id.* at 558-603.

The jury convicted Kaba on all counts.  *Id.* at 730-33.  On March 12, 2014, Kaba appeared for sentencing.  *Id.* at 736.  The prosecution read a victim impact statement on behalf of the woman.  *Id.* at 738-40.  Kaba also spoke on his own behalf.  *Id.* at 740-51.  The court adjudicated Kaba as a second violent felony offender pursuant to New York Criminal Procedure Law ("CPL") § 400.15, noting that he had two prior felony convictions, Dkt. 7 at 752, and thereafter sentenced Kaba to concurrent prison terms of fifteen years on the count of attempted first-degree rape, seven years on the count of first-degree sexual abuse, and one year on the count of criminal obstruction of breathing, all to run concurrently with each other and consecutively to a prison term of seven years on the count of second-degree burglary as a sexually-motivated felony.  *Id.* at 754-55.  The court also imposed a period of post-release supervision of fifteen years

on the rape count to run concurrently with periods of post-release supervision of ten

years on the burglary count and seven years on the sexual-abuse count.  *Id.*

### 3.  *The Direct Appeal*

On April 11, 2018, Kaba, represented by counsel, appealed to the

Appellate Division, Second Department, arguing that (1) because Detective Kenny may

have promised him that, if he gave a statement, then he could go home to his family, his

subsequent statements to the police were thereby rendered involuntary and negated the

*Miranda* warnings that he was given, (2) the hearing court abused its discretion by

denying his request to reopen the suppression hearing so that he could testify about

Detective Kenny's purported promise that, if he gave a statement, then he would be

permitted to go home to see his family, and (3) his sentence was harsh and excessive.

*Id.* at 759-812.  In a *pro se* supplemental brief, Kaba raised three additional claims: (1) his

pretrial statements should be suppressed because, in his view, the police lacked

probable cause to arrest him until after he gave his pretrial statements, (2) pursuant to

*Crawford v. Washington,* 541 U.S. 36 (2004), he was denied a fair trial because Detective

Quinones's failure to testify at trial deprived him of his confrontation right, and (3) his

waiver of his *Miranda* rights occurred after he gave his incriminating statements and

therefore his pretrial statements should have been suppressed.  *Id.* at 881-939.

On October 2, 2019, the Appellate Division affirmed Kaba's convictions

and sentence.  *Kaba I,* 107 N.Y.S.3d at 720.  The court held that "[t]he totality of the

circumstances surrounding [Kaba's] interrogation by police demonstrates that his statements, given after he was informed of, and waived, his *Miranda* rights . . . were voluntarily made." *Id.* (citations omitted).  It also found that "the court's determination not to reopen the hearing was not an improvident exercise of discretion." *Id.* (citation omitted).  The Appellate Division also held that "[t]he sentence imposed was not excessive." *Id.* (citation omitted).  Finally, it found that defendant's remaining contentions, including those raised in his pro se supplemental brief, [we]re without merit." *Id.*

On December 30, 2019, the New York Court of Appeals denied Kaba's application for leave to appeal.  *Kaba II*, 139 N.E.3d at 833.

b.   *Proceedings in this Court*

On October 15, 2020, proceeding *pro se*, Kaba filed the Petition asserting that (1) because Detective Kenny may have promised him that, if he gave a statement, then he could go home to his family, his subsequent statements to the police were thereby rendered involuntary and negated the *Miranda* warnings that he was given, (2) the hearing court abused its discretion by denying his request to reopen the suppression hearing so that he could testify about Detective Kenny's purported promise, (3) evidence removed from his home and his pretrial statements should have been suppressed as the fruit of an arrest without probable cause, (4) he was deprived of his right to present a defense when the interrogating officer did not testify at trial depriving

14

petitioner of his right to confrontation, and (5) his pretrial statements should have been suppressed because he testified at trial that he was not given *Miranda* warnings or permitted to read the *Miranda* form.  Dkt. 1.

On December 21, 2020, the District Attorney's Office filed its opposition to the Petition.  Dkt. 6.  On May 27, 2021, Kaba filed his reply.  Dkt. 16.

On February 2, 2024, the case was reassigned to the undersigned.

## DISCUSSION

**A.**      ***Federal Review of State Convictions***

A federal court may not grant a habeas petition on a claim that was adjudicated on the merits in state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see Harrington v. Richter*, 562 U.S. 86, 97-98 (2011); *Waiters v. Lee*, 857 F.3d 466, 477 (2d Cir. 2017).  Hence, when a claim is adjudicated on the merits, the state court's decision must be accorded "substantial deference." *Fischer v. Smith*, 780 F.3d 556, 560 (2d Cir. 2015) (citing *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009)).  "A federal court may reverse a state court ruling only where it was 'so lacking in justification that there was . . . [no] possibility for fairminded disagreement.'" *Vega v. Walsh*, 669 F.3d 123,

126 (2d Cir. 2012) (per curiam) (quoting *Harrington*, 562 U.S. at 103); *see also Wetzel v. Lambert*, 565 U.S. 520, 524 (2012) (per curiam) (quoting *Harrington*, 562 U.S. at 102).

## B. *Analysis*

On October 15, 2020, proceeding *pro se*, Kaba filed the Petition asserting that (1) his statements to the police were rendered involuntary as a result of Detective Kenny's purported promise that he could go home, (2) the hearing court abused its discretion by denying his request to reopen the suppression hearing, (3) the clothes and backpack removed from his home and his pretrial statements should have been suppressed as the fruit of an arrest without probable cause, (4) he was deprived of his Sixth Amendment confrontation because Detective Quinones did not testify, and (5) his pretrial statements should have been suppressed because he was not given *Miranda* warnings or permitted to read the *Miranda* form.  Dkt. 1.[3]  I address the first and fifth points together.

### a.  The **Miranda** *Claims*

"The People [bear] the burden of proving the voluntariness of defendant's statements beyond a reasonable doubt, including that any custodial interrogation was preceded by the administration and defendant's knowing waiver of his *Miranda* rights." *People v. Muller*, 64 N.Y.S.3d 698, 700 (3d Dep't 2017) (quoting *People v. Byrd*, 59 N.Y.S.3d

---

[3] Kaba also mentions in the beginning of the Petition that his sentence is excessive.  He does not, however, address this argument in any grounds of the Petition or in his Reply.  Accordingly, we decline to address this argument.

16

539 (3d Dep't 2017)).  "Properly administered *Miranda* rights can be rendered

inadequate and ineffective when they are contradicted by statements suggesting that

there is a price for asserting the rights to remain silent or to counsel." *Id.* "The

voluntariness of a statement made after *Miranda* warnings are given must be

determined by considering the totality of the circumstances under which it was

obtained." *Id.* (citation omitted).  Evidence of an oral confession must be suppressed if it

was obtained "by means of any promise or statement of fact, which promise or

statement creates a substantial risk that the defendant might falsely incriminate

himself." CPL § 60.45(2)(b)(1).

Kaba argues that he was not read his *Miranda* warnings, nor given an

explanation as to what he was doing when he signed the form waiving his *Miranda*

rights.  Dkt. 16 at 26.  He also argues, in the alternative, that even if his *Miranda*

warnings were given and his statements were uncoerced, he did not fully understand

these rights.  *Id.* at 27.  Finally, Kaba argues that as a result of Detective Kenny's

promise, his pretrial statements were not voluntarily made and were therefore in

violation of his *Miranda* rights.  *Id.* at 7.  Both the hearing court and the Appellate

Division rejected these claims on the merits; the Appellate Division specifically held

that the "[t]he totality of the circumstances surrounding the defendant's interrogation by

police demonstrates that his statements, given after he was informed of, and waived, his

*Miranda* rights . . . were voluntarily made." *See Kaba I,* 107 N.Y.S.3d at 720 (citations

17

omitted).  This determination is entitled to "substantial deference," *Fischer*, 780 F.3d at

560, and will not be overturned by a federal court conducting habeas review unless the

petitioner can establish that the state court's conclusion was "unreasonable," *see* 28

U.S.C. § 2254(d).

The Appellate Division's rejections of Kaba's *Miranda* claims are eminently

reasonable, and thus Kaba's *Miranda* claims do not entitle him to federal habeas relief.

As a threshold matter, Kaba was read his *Miranda* rights -- this was videotaped and

Kaba admitted this in his brief to the Appellate Division.  Dkt. 6 at 654-655, 937.

Further, as the hearing court held, Kaba could speak and understand English -- "he was

animated on the video, he was alert.  He gave an incredibly detailed statement."  Dkt. 7

at 62.  Detective Kenny also testified that Kaba fully understood what he was doing

when he signed the form waiving his rights.  *Id.* at 449, 492.

Moreover, Detective Kenny testified that she did not believe she told Kaba

he would be able to go home.  *Id.* at 37.  But even assuming that Detective Kenny did

make such a statement (which the hearing court also assumed), the statement "did not

create a substantial risk that [Kaba] might falsely incriminate himself."  *Id.* at 75.  The

totality of the circumstances here shows that the deception was not "so fundamentally

unfair as to deny [Kaba] due process."  *People v. Dunbar*, 958 N.Y.S.2d 764, 776 (2d Dep't

2013) (quoting *People v. Tarsia*, 50 N.Y.S.2d 944, 949 (2d Dep't 1980)).  Here, as the

hearing court noted, when Kaba was purportedly told that perhaps he could go home,

18

he gave an *exculpatory* statement, stating that the sexual encounter was consensual --

"[i]ndeed he [made] himself out, if believed, to be a good Samaritan who rescued the

woman from somebody else who was apparently, in his mind, going to do her wrong."

Dkt. 7 at 76.  Accordingly, this aspect of Kaba's *Miranda* claim fails.

### b.    *The Refusal to Reopen the Suppression Hearing*

Kaba also contends that the hearing court abused its discretion by denying

his request to reopen the suppression hearing so that he could testify about Detective

Kenny's purported promise that, if he gave a statement, then he would be permitted to

go home to see his family.  Dkt. 1 at 6.  The Appellate Division also rejected this claim

on the merits, because "the record demonstrate[d] that for the purpose of deciding the

suppression motion, the hearing court assumed that the promises had been made to the

defendant."  *See Kaba I*, 107 N.Y.S.3d at 720.  This determination is entitled to

"substantial deference," *Fischer*, 780 F.3d at 560, and will not be overturned unless Kaba

can establish that the state court's conclusion was "unreasonable," *see* 28 U.S.C. §

2254(d).

A suppression hearing may be reopened upon a showing that the

defendant has "discovered 'additional pertinent facts' that 'could not have been

discovered with reasonable diligence before the determination of the motion.'"  *People v.

Kindell*, 23 N.Y.S.3d 65, 67 (1st Dep't 2018) (alteration adopted) (quoting CPL

§ 710.40(4)).  "[B]ecause a defendant is presumed to know the circumstances of his or

19

her own arrest and therefore is capable of eliciting evidence of those circumstances at a

pretrial hearing, motions to re-open suppression hearings generally are denied where

the new facts proffered go only to the circumstances surrounding the defendant's

arrest." *People v. Velez*, 829 N.Y.S.2d 209, 212 (2d Dep't 2007) (collecting cases).  Here, the

hearing court had already heard testimony from Detective Kenny, and Kaba does not

allege that he discovered "additional pertinent facts" that warranted the reopening of

the suppression hearing.  *Kindell*, 23 N.Y.S.3d at 67.  Therefore, the court's decision not

to reopen the hearing constituted a reasonable application of the law and is entitled to

substantial deference.  Habeas relief is unwarranted on this claim.

    *c.*    *The Suppression of Evidence Arising from Kaba's Arrest*

        Kaba claims that evidence removed from his home and his pretrial

statements should have been suppressed as the fruit of an arrest without probable

cause.  Dkt. 1 at 7.  This claim also fails.  The Appellate Division rejected this claim on

the merits, *Kaba I*, 107 N.Y.S.3d at 720, and this determination is entitled to "substantial

deference," *Fischer*, 780 F.3d at 560.  It will not be overturned unless Kaba can establish

that the state court's conclusion was "unreasonable," *see* 28 U.S.C. § 2254(d).

        Kaba's argument fails on the merits, and therefore the decision of the

Appellate Division was reasonable and must be upheld.  The Fourth Amendment

provides that "[t]he right of the people to be secure in their persons, houses, papers, and

effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const.

amend. IV.  "Under the fruit of the poisonous tree doctrine, evidence acquired directly or indirectly as a result of an illegal search or arrest will be excluded" at trial for violation of the Fourth Amendment.  *United States v. Clark*, 822 F. Supp. 990, 1006 (W.D.N.Y. 1993) (citation omitted).  Probable cause to arrest exists when the arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).

The transcript from the suppression hearing and Kaba's trial make clear that, even before Kaba gave his statements to the police, the police had probable cause to arrest Kaba -- they had received the 911 call reporting the assault; Detective Kenny had interviewed the victim, who verified that she had been sexually assaulted; Detective Mathers had elicited from people at the shelter that they recognized the assailant captured in the surveillance footage as defendant; and Detective Kenny herself had recognized and had positively identified Kaba as the assailant depicted in the surveillance footage of the sexual assault.  Dkt. 7 at 4-6, 8-10, 33-34.  This was, as the trial court noted, "ample" evidence to "warrant a person of reasonable caution in the belief" that Kaba had committed the sexual assault here.  *Escalera*, 361 F.3d at 743. Accordingly, officers had probable cause to arrest Kaba, and therefore Kaba's pretrial

statements and the evidence removed from his home should not have been suppressed.

Kaba's Fourth Amendment claim therefore fails.

### d.     The Confrontation Claim

Finally, Kaba claims that he was denied his right to confront witnesses against him because Detective Quinones, who elicited Kaba's pretrial statement, did not testify at trial. This claim also fails. The Appellate Division rejected this claim on the merits, and its decision will not be overturned unless Kaba can establish that it was unreasonable, *see* 28 U.S.C. § 2254(d).

The Sixth Amendment's Confrontation Clause provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. In *Crawford*, the Supreme Court held that "out-of-court statements by witnesses that are testimonial are barred, under the Confrontation Clause, unless witnesses are unavailable and defendants had prior opportunity to cross-examine witnesses, regardless of whether such statements are deemed reliable by court." 541 U.S. at 54, 58. It specifically identified "[v]arious formulations of th[e] core class of 'testimonial' statements" that are barred absent cross-examination:

> (1) "*ex parte* in-court testimony or its functional equivalent -- that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially";

(2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and

(3) "statements . . . made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Id.* at 51-52 (citations omitted). Under Rule 801 of the Federal Rules of Evidence, however, an admission that was either made or adopted by the defendant is admissible at trial. Fed. R. Evid. 801(d)(2).

"[T]he basic objective of the Confrontation Clause . . . is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial." *Michigan v. Bryant,* 562 U.S. 344, 358 (2011).

Here, there was no confrontation violation when Detective Quinones did not testify. First, the statements contained in the written statement transcribed by Detective Quinones were Kaba's own, and thus they do not present a confrontation issue. Second, Detective Kenny (1) was present when Kaba gave his statement to the police, (2) testified that the statement that Detective Quinones wrote down accurately reflected what Kaba had said, and (3) was subject to cross-examination at trial. Dkt. 7 at 483-506. Moreover, Kaba signed the statement that Detective Quinones drafted in Detective Kenny's presence. *Id.* at 571=72. This was therefore the admission of a party-opponent statement. Fed. R. Evid. 801(d)(2). Accordingly, Kaba's confrontation claim fails.

23

*CONCLUSION*

Kaba has failed to show a basis for relief under 28 U.S.C. § 2254.

Accordingly, his habeas petition is denied.   Additionally, I decline to issue a

certificate of appealability because Kaba has not made a substantial showing of the

denial of a constitutional right.   *See* 28 U.S.C. § 2254.

The Clerk of the Court shall enter judgment accordingly and close this

case.   The Clerk of the Court shall also mail copies of this memorandum decision and

the judgment to Kaba at the address set forth above.

SO ORDERED.

Dated:      New York, New York
            March 7, 2024

DENNY CHIN
United States Circuit Judge
Sitting By Designation

24